**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:07CV22-MU**

| | |
|---|---|
| SYLVIA BETHEA, )<br>      Plaintiff, )<br>              )<br>      vs.          )<br>              )<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social )<br>Security Administration, )<br>      Defendant. )<br>              ) | **MEMORANDUM AND RECOMMENDATION** |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment" (document #11) and "Memorandum in Support ... " (document #12), both filed October 22, 2007; and the Defendant's "Motion For Summary Judgment" and "Memorandum in Support of the Commissioner's Decision" (both document # 13), filed December 17, 2007. This case has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned will respectfully recommend that Plaintiff's Motion for Summary Judgment be denied; that Defendant's Motion for Summary Judgment be granted; and that the Commissioner's decision be affirmed.

**I. PROCEDURAL HISTORY**

On January 14, 2003, the Plaintiff filed an application for a period of disability and Social Security disability benefits ("DIB"), alleging she was unable to work as of October 2, 2002, due to pain in her left arm and shoulder. The Plaintiff's claim was denied initially and upon

reconsideration.

The Plaintiff filed a timely Request for Hearing, and on May 24, 2005 a hearing was held before an Administrative Law Judge ("ALJ"). In a decision dated July 13, 2005, the ALJ denied Plaintiff's claim, and by notice dated November 24, 2006, the Appeals Council denied her request for further administrative review.

The Plaintiff filed the present action on April 24, 2007, and the parties' cross-motions for summary judgment are ripe for disposition.

## II. **FACTUAL BACKGROUND**

At the hearing, the Plaintiff testified that she was born on May 23, 1956 and was 49 years-old; that she was 5'2" tall and weighed 200 pounds; that she was single and lived in a house with her two children, a daughter, age 20, and a son, age 18, who attended high school; that she had graduated from high school and taken some college courses; that she had prior work experience as a department store salesperson, which required lifting 50 to 60 pounds, and as an "order puller" at a Family Dollar distribution center; that she also had 14 years experience working as an "assembler" for United Technologies; and that she was presently unable to work due to arm, leg, foot, neck and back pain.

Concerning her medical condition, the Plaintiff testified that she had arthritis in her back which prevented her from standing for an entire eight-hour workday; that she had carpal tunnel syndrome in both arms; that she had been in an automobile accident; that she had "stabbing" left knee pain; that she has had surgery on her left foot, which remained painful; that her short term memory was "kind of" bad; and that her pain medication made her drowsy.

The Plaintiff testified concerning her daily activities that she could bathe and dress herself

only with assistance from her daughter; that she had a driver's license, but had not driven in two years; that she walked with a cane; that she went grocery shopping with her children, who also performed most of the Plaintiff's household chores and yard work; that she attended church twice per month; that she could walk no more than 12 feet, and could sit or stand for only 20 minutes; that her daughter left for work at 8:00 a.m and her son left for high school at 8:15 a.m; that she spent most days talking with a friend who would visit; that she normally ate a sandwich for lunch at 1:00 p.m.; that she would go outside and look at her two Golden Retrievers; that she went to the post office regularly; and that she managed her own checking account. The Plaintiff denied watching more than 30 minutes of television per day, and even then, only news programs.

The Plaintiff's son, Eric Bethea, testified that he and his sister "usually" performed all of the household chores; that the Plaintiff complained of arm and leg pain; that he and his mother regularly watched television; that his mother watched "mostly" soap operas; and that he worked an evening job at a Harris Teeter grocery store.

A Vocational Expert ("VE") testified at the hearing, classifying the Plaintiff's prior work experience as light and semiskilled (sales person and assembler) and medium and unskilled (order puller and janitor[1]).

The ALJ then presented the VE with the following hypothetical:

> assume ... a Claimant with the same age, education and work experience as {the Plaintiff]. Are there any jobs at both the light and sedentary exertional level that would accommodate the following: No bending, squatting, stooping, kneeling, repetitive climbing or stairs or ladders or similar structures, a job that would permit a sit/stand work option with the ability to sit for 15 minutes ... every two hours and no work around heights or dangerous equipment. Are there any jobs at the light and

---

[1] Although the Plaintiff did not testify concerning her janitorial job, her earnings record confirms that she worked as a janitor for two years.

sedentary exertional level?

(Tr. 369).

The VE testified in response that with those limitations, the Plaintiff would be able to perform the following sedentary, unskilled jobs: food checker, cashier, and information clerk (sedentary) with a total of 13,041 of those jobs available in North Carolina; and two light and unskilled jobs: cashier II and information clerk (light), with 3,460 of these additional jobs in North Carolina.

In a "Disability Report," dated January 7, 2003, the Plaintiff stated the she stopped working because of her "doctor's orders"; and that she had completed three years of college. The Agency interviewer who took the report noted that the Plaintiff had no difficulty breathing, seeing, speaking, hearing, sitting, walking, standing, using her hands, writing, reading, understanding, thinking coherently, concentrating or answering.

On February 10, 2003, William Farley, M.D., a medical expert for North Carolina Disability Determination Services ("NCDDS"), completed a Physical Residual Functional Capacity Assessment, concluding that the Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, could sit, stand and/or walk six hours in an eight hour workday, and had unlimited ability to push or pull, provided that the Plaintiff's ability to perform "fingering" was limited. Dr. Farley concluded that the Plaintiff was capable of performing medium work with no frequent fingering. In support of his conclusions, Dr. Farley noted that the Plaintiff's medical record showed that although Plaintiff complained of arm and shoulder pain following a October 2, 2002 traffic accident, an examination performed that day showed that she had full range of motion with only "some" decreased grip strength in her left hand; that X-rays taken of the Plaintiff's left shoulder, arm and

wrist, and spine were normal; that on November 8, 2002, the Plaintiff was diagnosed with "mild" carpal tunnel syndrome in her left wrist; and that a January 27, 2003 MRI of Plaintiff's cervical spine had showed "minimal" stenosis, which did not warrant cervical injections.

On February 28, 2003, a second Agency medical expert, whose name is illegible in the record, reviewed and concurred in Dr. Farley's evaluation.

On May 1, 2003, William Brian, D.O., an Agency psychiatric consultant, completed a Psychiatric Review Technique and concluded that Plaintiff suffered from an adjustment disorder consisting of anxiety and depressed mood, which caused, at most, mild restriction in activities of daily living and moderate (that is, non-disabling) restriction in social function and concentration; but that there was no evidence of any episodes of deterioration in a work-like setting.

The same day, Dr. Brian completed a Mental Residual Functional Capacity Assessment and concluded that Plaintiff had moderate, non-disabling limitations to her ability to concentrate for extended periods, to maintain a regular work attendance, and to interact appropriately with the public, co-workers, and/or superiors; but that Plaintiff's ability to understand, remember, and carry out both simple and detailed instructions, to work an ordinary routine without special supervision, to work with others, to make work-related decisions, to ask questions or request assistance, to maintain appropriate workplace behavior, and to adapt to the work environment was unlimited. Dr. Brian specifically noted that the Plaintiff's memory and concentration were "intact."

Although, as discussed below, the Plaintiff contends that the ALJ failed to give "proper weight" to the opinions of her doctors, the parties have not assigned error to the ALJ's recitation of the Plaintiff's medical records. Moreover, the Court has carefully reviewed the Plaintiff's medical records and finds that the ALJ's recitation is accurate. Accordingly, the undersigned adopts the

5

ALJ's statement of the medical record, as follows:

> The medical records show that prior to the alleged date of disability onset the claimant had complaints of knee pain diagnosed as arthritis as well as pain related to bilateral carpal tunnel syndrome, and that she had also complained of left ankle pain diagnosed as related to tendon dysfunction. However, despite these complaints, the claimant was able to work. Then, on October 2, 2002, the claimant was involved in a motor vehicle accident, and complained of neck and left side pain. Following this accident, the claimant sought treatment from Dr. John W. Pascal, her family physician. Dr. Pascal's records show that by December 26, 2002, the claimant reported that she was feeling well and that her shoulder pain had improved. However, on December 30, Dr. Pascal's records show that work activity exacerbated the claimant's shoulder pain. In the meantime, On October 9, 2002, the claimant had been examined at Charlotte Orthopedic Specialists, and her pain was diagnosed as related to a cervical strain or sprain. The claimant was advised to treat her symptoms with heat and exercise, and the examining orthopedist opined that he expected the claimant to make a full recovery. Also, on November 8, 2002, the claimant was examined by Dr. Frederick Pfeiffer, a neurologist, who opined that an EMG/NCV revealed that the claimant had only mild bilateral carpal tunnel syndrome and that she had no evidence of cervical radiculopathy. Then, in December 2002 and January 2003, the claimant was treated at Southeast Pain Care for complaints of continuing left arm pain. Their records show that the claimant was advised to use a brace and was initially offered an injection. However, on January 27, 2003, the treating physician opined that no injections were warranted in light of the results of a cervical MRI, which revealed only minimal degenerative disc disease. There is no record that the claimant returned to Southeast Pain Care for any further treatment. (Exhibits 2F, 3F, 4F and 5F).
>
> Later medical records show that on April 17, 2003 the claimant was evaluated by M. Patricia Hogan, Ph.D., who reported that the claimant, who was right hand dominant, said she could barely use her left arm, that she had chronic throbbing pain, that she had numbness in her legs and that she had to shift positions frequently. Dr. Hogan also reported that the claimant said her sleep was disturbed by pain, but also reported that the claimant said she had "gotten used to doing things one handed". Dr. Hogan observed that the claimant had no apparent deficits in motor function or gait, and reported that the claimant said she was able to drive. Dr. Hogan also opined that the claimant was alert and oriented, and diagnosed her with an adjustment disorder with anxiety and depression related to her motor vehicle accident. Then, on April 27, 2003 the claimant was examined by Dr. Carl T. Augustus, who reported that the claimant said that she had experienced a crush injury to her left arm and elbow, that her sleep was disturbed by pain and that she was unable to lift or carry on account of back pain. However, Dr. Augustus found that the claimant had full range of motion, that all her joints were normal, that she had a normal gait, that she could move about with little difficulty, that she could heel and toe walk without difficulty, that her ability to perform

dexterous movements was intact, that she was able to move her shoulders and arms without difficulty, and that her ability to pinch, grasp and manipulate objects was intact. Dr. Augustus also opined that although the claimant said she had shortness of breath, she displayed no evidence thereof, and further opined that although the claimant had hypertension and reflux, there was no evidence that she experienced any functional limitations from those conditions. (Exhibits 6F and 7F).

Later medical evidence also shows that the claimant continued in treatment with Dr. Pascal. His records show that the claimant was treated for a variety of apparently minor and short term ailments, such as bronchitis and sinusitis, from which she apparently made rapid and routine recovery. His records also show that the claimant had ongoing complaints of arthritic pain her neck and shoulder, as well as complaints of chronic numbness in her hands and arms. Then, in September 2003, the claimant was examined by Dr. Sarjoo Bhagia, an orthopedist, for complaints of chronic neck pain with left side radiculopathy. However, Dr. Bhagia, who noted that the claimant was able to drive, found that an MRI revealed only minimal defects, and concluded that the claimant had no cervical spine defects. He diagnosed the claimant with a cervical strain/sprain, and there is no indication that the claimant returned to him for further treatment. Dr. Pascal's later records show that in March 2004 the claimant complained of left ankle swelling and wrist numbness, and that in April 2004 she again complained of numbness. His records next show that on May 10, 2004, while at work, the claimant, who had been carrying boxes of shoes on stairs, missed a step and injured her foot. Dr. Pascal's records show that the claimant continued to report left foot and knee pain despite medication, and on July 15, 2004, she was referred to Dr. Ronald Singer, an orthopedist, for evaluation of her left knee pain. Dr. Singer's records show that an x-ray revealed that the claimant had mild osteoarthritis, and that he advised the claimant to avoid bending and stairs. On August 26, 2004, Dr. Singer reported that the claimant was slowly getting better, that she had some swelling in her knee with activity and that she was exercising at home by riding an exercise bicycle. Also, on August 10, 2004, the claimant was referred to Dr. Bruce Cohen, also an orthopedist, for treatment of left foot and ankle pain with decreased strength. Dr. Cohen's records show that an MRI revealed that the claimant had tendinopathy, and he diagnosed her with left tibial tendon insufficiency. (Exhibits 8F and 1 OF).

Dr. Singer's later records show that in September 2004 he found that the claimant had a left knee meniscus tear, and that on October 11, 2004 he performed arthroscopic surgery on her left knee. Following surgery Dr. Singer reported that the claimant had good range of motion in her knee and by January 5, 2005, reported that the claimant had only mild tenderness in her knee. In the meantime, the claimant had also remained in treatment with Dr. Cohen, who performed tendon reconstruction surgery on the claimant's left ankle in November 2004. On November 30, 2004, Dr. Cohen reported that the claimant's left ankle range of motion was improving, and that in 2 weeks she would be able to begin to get back to work. By January 2005 both Drs. Singer and Cohen

opined that the claimant was capable of doing sit down work. Dr. Cohen's later records show that in February 2005 the claimant reported that with use of a prescribed orthotic she was able to wear tennis shoes, and Dr. Cohen opined that the claimant remained able to do light work. Then, in March and April 2005 Dr. Cohen reported that the claimant continued to have "some" pain. In the meantime, the claimant also continued in treatment with Dr. Singer, whose later records show that the claimant continued to have some degree of knee pain, and that she underwent a series of 5 injections in her knee. Dr. Singer's records show that on March 23, 2005 he opined that the claimant could return to work, but that she had to sit for 15 minutes every 2 hours, that she was not to lift more than 20 pounds, that she was not to push or pull more than 10 pounds, and that she was not to climb stairs. Then, on April 27, 2005, Dr. Singer found that the claimant had full range of motion in her left knee and no instability, and opined that had a 15 percent permanent partial impairment. He further opined that she was precluded from bending, kneeling, squatting or stooping, and that she was not to lift, push or pull more than 10 pounds. He also prescribed a cane. However, Dr. Singer did not explain why he had reduced the claimant's capacity to lift and carry from 20 pounds to 10 pounds. (Exhibits 8F and 1 IF).

Finally, the medical records show that Dr. Pascal's later records show that the claimant had ongoing complaints of elbow pain, and that following a fall in November 2004, she had complaints of low back pain, which Dr. Pascal diagnosed as resulting from a sprain. Other later medical records show that on April 14, 2005 the claimant was examined by Dr. William B. Guyton, who reported that the claimant complained of low back, neck, shoulder, left elbow and right foot pain with numbness and tingling. Dr. Guyton's records show that x-rays of the claimant's cervical and lumbar spine showed normal discs, and that Dr. Guyton diagnosed the claimant with osteoarthritis, bilateral carpal tunnel syndrome and left tennis elbow. (Exhibits 10F and 12F).

(Tr. 14-16.)

In her brief, the Plaintiff characterizes Dr. Pascal as being of the opinion that she was "permanently disabled," but she concedes that the only arguable evidence of such an opinion is an application for a handicapped parking automobile placard that is blank except for Dr. Pascal's name, address and signature. (Tr. 316.) In other words, the purported "opinion" does not mention the Plaintiff, much less identify or discuss her allegedly-disabling condition.

The ALJ considered the above-recited evidence and determined that the Plaintiff was not "disabled" for Social Security purposes.

## III.  STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam).  The district court does not review a final decision of the Commissioner de novo.  Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence.  Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true

even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. DISCUSSION OF CLAIM

The question before the ALJ was whether at any time the Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[2] The ALJ considered the above-recited evidence and found after the hearing that the Plaintiff had not engaged in substantial gainful activity at any time relevant to his decision; that the Plaintiff's "severe left arm injury with residuals, left knee arthritis with status post arthroscopy, left tibial tendon insufficiency with status post surgery, bilateral carpal tunnel syndrome, and osteoarthritis" were severe impairments; but that Plaintiff's impairments or combination of impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that Plaintiff could no longer perform her past relevant work; that the Plaintiff was a "younger individual" with a high school education and transferable skills; and that the Plaintiff retained the residual functional capacity to perform light[3] work with the additional

---

[2]Under the Social Security Act, 42 U.S.C. § 301, et seq., the term "disability" is defined as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

[3]"Light" work is defined in 20 C.F.R. § 404.1567(b) as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

limitations that she cannot bend, squat, stoop, kneel or repetitively climb stairs, that she requires a sit/stand option with the opportunity to sit for 15 minutes every 2 hours, and that she cannot work around heights or dangerous machinery.

After noting correctly that Medical-Vocational Rules 202.22 would require a finding of "not disabled" for a person of comparable age and education who could perform a "full range" of light work, the ALJ then shifted the burden to the Secretary to show the existence of other jobs in the national economy which the Plaintiff could perform. The VE's testimony, stated above and based on a hypothetical that factored in the limitations discussed above, provided substantial evidence that there were a significant number of jobs in the national economy that the Plaintiff could perform, and, therefore, that the Plaintiff was not disabled.

The Plaintiff essentially appeals the ALJ's determination of her residual functional capacity ("RFC"). See Plaintiff's "Motion for Summary Judgment" (document #11) and "Memorandum of Law ..." (document #12). However, the undersigned finds that there is substantial evidence supporting the ALJ's finding concerning the Plaintiff's residual functional capacity.

The Social Security Regulations define "residual functional capacity" as "what [a claimant] can still do despite h[er] limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

The ALJ's opinion clearly indicates that he did, in fact, consider whether Plaintiff's alleged impairments limited her ability to work. Agency medical experts determined that the Plaintiff had the residual functional capacity for medium work – could occasionally lift 50 pounds and frequently lift

11

25 pounds; that she could sit, stand, and/or walk 6 hours in an 8-hour workday; and that her ability to push and/or pull was unlimited – with no non-exertional limitations other than avoiding frequent fingering.

The ALJ found the Plaintiff able to work, however, based upon a residual functional capacity only for light or sedentary work plus non-exertional limitations that she cannot bend, squat, stoop, kneel or repetitively climb stairs, that she requires a sit/stand option with the opportunity to sit for 15 minutes every 2 hours, and that she cannot work around heights or dangerous machinery.

There was also substantial evidence supporting that the ALJ's conclusion that the Plaintiff's ability to work was not affected by the Plaintiff's alleged mental impairment, whether formulated as a deficiency in short term memory as the Plaintiff testified, or suffering from anxiety and a depressed mood as Agency psychological experts concluded. The Plaintiff told Dr. Hogan that she had never sought or had any mental health treatment, and clarified that she was not seeking disability due to a mental condition. (Tr. 188-90.) Moreover, Dr. Hogan placed no limitations on the Plaintiff's ability to work, and in completing the Psychiatric Review Technique and Mental Residual Functional Capacity Assessment, Dr. Brian concluded that the Plaintiff's anxiety and depressed mood were not disabling. In other words, unlike the Plaintiff's impaired physical condition, which the ALJ did take into account in formulating the Plaintiff's RFC, nothing in the record even suggests that the Plaintiff suffered functional limitations as a result of her anxiety and depressed mood.

As noted above, the Plaintiff assigns error to the ALJ's alleged failure to give "proper weight"[4]

---

[4]Notably, the Plaintiff does not contend that any of her physician's opinions should have been given "controlling weight." Moreover, the Fourth Circuit has established that a treating physician's opinion need not be afforded controlling weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). A treating physician's opinion on the nature and severity of the alleged impairment is entitled to controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2) (2002); and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).

to Dr. Pascal's alleged opinion that the Plaintiff was "permanently disabled," and the restrictions that Dr. Singer and Dr. Cohen placed on her activities: no lifting, pushing, or pulling more than 10 pounds; and no bending, kneeling, squatting, or repetitive stair or ladder climbing (Dr. Singer); and sitting 15 minutes every two hours. (Dr. Cohen).

At the outset, the undersigned notes that there is no indication in the record that Dr. Pascal ever opined that the Plaintiff permanently was unable to work. At most, Dr. Pascal assisted the Plaintiff in obtaining a handicapped parking placard, which is merely cumulative of other evidence in the record supporting the ALJ's essential conclusion that the Plaintiff suffered from a variety of severe but non-disabling impairments. Indeed, the fact that the Plaintiff sought a handicapped parking placard belies, at least to some extent, her contention that she stopped driving in 2003.

Moreover, the ALJ expressly stated that he gave "great weight" to the records and opinions of Dr. Pascal, Dr. Singer and Dr. Cohen in rejecting the opinions of the State Agency medical consultants, discussed above, who had concluded that the Plaintiff could perform a full range of medium work. (Tr. 20.) The ALJ included Dr. Cohen's single limitation – the opportunity to sit for 15 minutes every 2 hours – in the Plaintiff's RFC, and also included Dr. Singer's recommendation that the Plaintiff avoid any bending, kneeling, or squatting, or any repetitive stair or ladder climbing.

The ALJ also discussed the apparent contradiction in Dr. Singer's records in which he alternately limited the Plaintiff to a maximum of 10 or 20 pounds of lifting. After thoroughly discussing the medical record, particularly Dr. Singer's final April 2005 assessment that in

---

Therefore, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro, 270 F.3d. at 178, citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

13

combination, the Plaintiff's impairments caused only a 15% overall body impairment, the ALJ limited the Plaintiff's RFC to light work or 20 pounds lifting.[5]

In addition to the recitation and discussion above, the medical record is also clear that the Plaintiff's condition was never as severe as she claimed. Although the Plaintiff testified that her ability to sit and stand was limited, Dr. Singer repeatedly found that she could work so long as she could sit 15 minutes every two hours. The Plaintiff testified that she could stand for only 20 minutes due to back pain, but the medical records show that she complained of back pain only intermittently, that diagnostic tests of her spine showed only mild osteoarthritis and normal disc spacing, and that the Plaintiff's back pain was invariably diagnosed as muscle strain or sprain.

Similarly, there is no confirmation in the medical record of the Plaintiff's testimony that she could walk only 12 feet or that her ability to walk otherwise was severely limited. As the ALJ concluded on this point, "[i]t is ... unpersuasive that Drs. Singer and Cohen, given the nature of the [Plaintiff's] impairments and their treatment of those impairments, would fail to notice such an extreme limitation in [her] ability to walk." (Tr. 18.)

Although the Plaintiff testified that she ceased driving soon after her October 2002 traffic accident, on April 17, 2003, she told Dr. Hogan that she was driving.

Finally on this point, notwithstanding the Plaintiff's testimony that her pain medication made her drowsy which interfered with her ability to work, she never expressed that concern to any of her doctors.

The record is also clear that the Plaintiff engaged in significant daily life activities during the

---

[5]Even had the ALJ limited the Plaintiff to the 10 pound sedentary lifting restriction, the VE's testimony that there were more than 13,000 sedentary jobs in this State that the Plaintiff could still perform would have supported the ALJ's ultimate conclusion that the Plaintiff was not disabled.

subject period, such as driving, visiting with friends, watching television, attending church, going to the post office and grocery store, and managing her finances. On the relevance of an ability to engage in substantial daily activities to a disability claim, see, e.g., Mickles, 29 F.3d at 921 (plaintiff performed "wide range of house work," which supported finding of non-disability); and Gross, 785 F.2d at 1166 (evidence that plaintiff washed dishes and generally performed household chores supported finding of non-disability).

The ALJ also properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain and, in this case, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was not fully credible.

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), citing 20 C.F.R. § 416.929(b); and § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1); and § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Craig, 76 F.3d at 595 (citations omitted).

The record contains evidence of Plaintiff's "severe left arm injury with residuals, left knee arthritis with status post arthroscopy, left tibial tendon insufficiency with status post surgery, bilateral carpal tunnel syndrome, and osteoarthritis" – which <u>could</u> be expected to produce some of the pain claimed by Plaintiff – and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in <u>Craig</u>. However, the ALJ also correctly evaluated the "intensity and persistence of her pain, and the extent to which it affects her ability to work," and found Plaintiff's subjective description of her limitations not credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." <u>Mickles</u>, 29 F.3d at 921, citing <u>Hunter v. Sullivan</u>, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between the Plaintiff's claims of inability to work and her objective ability to carry on a moderate level of daily activities, as well as the objective medical record discussed above.

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." <u>Seacrist v. Weinberger</u>, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that Plaintiff suffered from, but was not disabled from working, by her combination of impairments.

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's

16

designate, the ALJ)." Mickles v. Shalala, 29 F.3d 918, 923 (4th Cir. 1994), citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's treatment of the medical records and ultimate determination that the Plaintiff was not disabled.

## V. RECOMMENDATIONS

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that Plaintiff's "Motion for Summary Judgment" (document #11) be **DENIED;** that Defendant's "Motion for Summary Judgment" (document #13) be **GRANTED**; and that the Commissioner's determination be **AFFIRMED.**

## VI. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder, 889 F.2d at 1365. Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Wells, 109 F.3d at 201; Page, 337 F.3d at 416 n.3; Thomas v. Arn, 474 U.S. 140, 147 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel

for the parties; and to the Honorable Graham C. Mullen.

       **SO RECOMMENDED AND ORDERED**.

                          Signed: January 4, 2008

                          Carl Horn, III
                          United States Magistrate Judge